In 1918, Sidney C. McLouth, owner of a small ship yard at Marine City, Michigan, entered into a contract with the United States Shipping Board Emergency Fleet Corporation, hereinafter referred to as the Fleet Corporation, a distinct entity organized under the laws of the District of Columbia, with the government owning all of the stock. The contract together with a supplement thereto provided for the construction of nine ocean-going tugs. It stated that the Fleet Corporation represented the United States of America, and that the title to the tugs and work in process would be in the government, and that title to all materials for the furtherance of the work under the contract, however *Page 194 
and by whom contracted for, would be in the Fleet Corporation.
After the armistice was declared, work under the contract was suspended, and on May 24, 1920, a formal settlement agreement was entered into between McLouth, as contractor, and the Fleet Corporation, as owner, acting for the government. It provided for the payment of a specific sum to the contractor; that the title to all materials of every kind procured for or in connection with the construction contract should vest in the Fleet Corporation; that the contractor McLouth waived all claims for prospective profits, and that the contractor would store certain materials left with him as bailee. It further provided in the preamble that the contractor had made certain commitments and subcontracts for materials and supplies prior to the time he received notice to suspend operations, and that the parties desired to have the subcontracts and commitments adjusted and paid, and that the contractor had presented to the owner all of its claims of every nature in connection with the suspension of the construction contract. Article 2 of the contract stated that the contractor bargained, sold and conveyed to the owner all rights, title, and interest in the subcontracts and commitments in connection with the original contract then outstanding and unpaid which a proper audit by the owner would show to have been properly incurred for work under the contract and which did not exceed its requirements; and that the owner should forthwith adjust and pay such of the subcontracts and commitments as should, in the judgment of the owner, be proper under the contract.
In order to obtain materials for constructing the tugs, the contractor had made a binding commitment *Page 195 
to purchase lumber from Ingram-Day Lumber Company, a Wisconsin corporation, operating at Lyman, Mississippi. When McLouth's contract with the Fleet Corporation was terminated after the armistice, he attempted to cancel this commitment. The contract price for the lumber was $59,153.71 and the lumber company claimed that it was entitled to $44,000 in settlement of its claim against McLouth. All but a very small part of the sum so claimed represented "anticipated profits" or loss of profits claimed to have been suffered by the lumber company through the cancellation. The record leaves no doubt but that McLouth's commitment to the lumber company was assumed by the Fleet Corporation in the settlement with McLouth. On April 9, 1920, prior to the execution of the settlement agreement, a letter from one of the Fleet Corporation's adjusters to another, stated the lumber company's claim against McLouth had been forwarded to Washington for action of the construction claims board, and that "we have assumed payment of all commitments." On June 1, 1920, the assistant secretary of the construction claims board wrote the district adjuster that by the terms of the settlement the Fleet Corporation was to assume all of McLouth's commitments under the contract. On August 9, 1920, the secretary of the construction claims board sent McLouth a long list of the latter's commitments which were to be assumed, adjusted and settled by the Fleet Corporation under the terms of the previous agreements. The list specifically included McLouth's commitment to the lumber company for $59,153.71 for yellow pine and the latter's cancellation charge of $44,000.
McLouth also became indebted to the government in the sums of $7,134.15, for the purchase of lumber, *Page 196 
$1,000 for the balance due on three unassembled engines, and $27,461.65, for the value of certain shipbuilding materials and supplies stored by the Fleet Corporation in McLouth's yard in accordance with the settlement agreement, and used by him.
We shall only make a cursory review of the litigious journey pursued in the effort to recover on the respective claims of the lumber company and the government. The lumber company brought suit against McLouth in the United States district court for the eastern district of Michigan. The Fleet Corporation wrote to McLouth that its records showed the claim to be one of the commitments it had assumed, and therefore was a matter for it to settle. The government through its own attorneys took over the defense of the suit, which resulted adversely to McLouth, notwithstanding appeals to the circuit court of appeals and the supreme court. See Ingram-Day LumberCo. v. McLouth, 6 Fed. (2d) 471, 13 Fed. (2d) 581 (C.C.A.), and 275 U.S. 471 (48 Sup. Ct. 153). The Supreme Court held that as the lumber company's contract with McLouth by its terms was an independent one, and not made dependent on or subject to the Fleet Corporation's contract, the lumber company was entitled to a judgment of $42,789.96 for its damages and interest. This judgment has not been paid.
McLouth died in 1923, and an administrator was appointed for his estate, which was insolvent. The United States to which all property and claims of the Fleet Corporation had been assigned, brought suit against the administrator de bonis non in the United States district court for the eastern district of Michigan, and recovered judgment on April 25, 1933, for $40,165.48. The administrator attempted to interpose a claim of set-off based on the liability *Page 197 
of the government to pay the lumber company's judgment, but the trial judge refused to consider it on the ground that there was no proof that it had been presented to the general accounting office of the government in accordance with Rev. Stat. § 951 (28 USCA, § 774). This judgment was affirmed on appeal.(Shaw v.United States [C.C.A.], 75 Fed. [2d] 175).
In 1934, at the second session of the 73d Congress, a bill was passed authorizing payment of the lumber company's judgment, but was vetoed by the president. In 1933, the government filed a proof of claim against McLouth's estate based on the judgment obtained in Federal court. The claims of the lumber company and one Goldman had theretofore been filed and allowed. These creditors for the first time had the opportunity of opposing the government's claim and presenting the question of set-off. The probate court disallowed the set-off, and allowed the government's claim as one of the third class with priority over those of the general creditors. On appeal to the circuit court for St. Clair county, the trial judge held that the claim of set-off was proper, thus extinguishing the government's claim, which was less than the claimed set-off. The government has appealed to this court.
In view of our decision, it is unnecessary to discuss appellee's contention that in no event should the government's claim be entitled to priority which, if allowed, would not only result in the government's taking all the remaining assets of the estate, but also raise the question of the repayment by general creditors Of a 15 per cent. dividend paid them prior to the filing of the government's claim. We also limit our discussion to questions raised in the briefs. *Page 198 
Counsel for the government concedes that the former obstacle to the effect that the claim of set-off was not passed upon by the government's accounting officers, under Rev. Stat. § 951 (28 USCA, § 774), no longer exists. The defense of statutes of limitations as against the set-off is neither pleaded nor claimed. See Bull v. United States, 295 U.S. 247
(55 Sup. Ct. 695). The government further concedes that the set-off was not considered on its merits in the previous litigation and that the judgment in the district court, affirmed in the circuit court of appeals, is not res judicata as to the estate's right to present the set-off on its merits.
The government does claim that the administrator's sole remedy, if any, is to sue the government by petition filed in the court of claims, as provided in Judicial Code, § 24, par. 20 (28 USCA, § 41 [20]) and Judicial Code, § 145 (28 USCA, § 250) unless such right is barred by the limitations prescribed in those permissive statutes, and even if then barred, the suit might be prosecuted through the passage of a special act of Congress, similar to 65 special acts passed during the 74th session of Congress permitting Federal courts to take jurisdiction of claims against the United States which were otherwise barred.
Appellees contend that the Federal court acquired no jurisdiction in a suit brought against an administrator for a debt contracted by the decedent in his lifetime. This contention is answered in Commonwealth Trust Co. of Pittsburgh
v. Bradford, 297 U.S. 613 (56 Sup. Ct. 600), where the court said:
"The jurisdiction of Federal courts to entertain suits against the latter (such fiduciaries as guardians, administrators, executors, etc.), is clear, when instituted in order to determine the validity of *Page 199 
claims against the estate or claimants' interests therein. Such proceedings are not in rem; they seek only to establish rights; judgments therein do not deal with the property and order distribution; they adjudicate questions which precede distribution." Citing: Byers v. McAuley, 149 U.S. 608, 620
(13 Sup. Ct. 906); Security Trust Co. v. Black River NationalBank, 187 U.S. 211, 227 (23 Sup. Ct. 52); Waterman v.Canal-Louisiana Bank Trust Co., 215 U.S. 33, 43
(30 Sup. Ct. 10); Riehle v. Margolies, 279 U.S. 218, 223 (49 Sup. Ct. 310), and other cases.
Appellees further contend that even if the judgment is good as against the administrator, it may be attacked by creditors who have not had the opportunity to defend against it, and who, in an insolvent estate, are the interested parties. In passing to the larger question of whether the claim of set-off against the government may be entertained in the present suit, we again refer to appellant's reply brief wherein it is conceded that the rights of creditors were preserved for determination by the probate court and the creditors have availed themselves of this right by the present contest and cannot complain that they are not having their day in court.
Appellant contends that the claim for set-off must fall into one of two categories, as either a claim for "just compensation" or for breach of contract, and that if it is the former, it is ruled by United States v. Skinner EddyCorporation (C.C.A.), 35 Fed. (2d) 889, which holds that in the case of war contracts with the Fleet Corporation the claimant must pursue the remedy provided by the special statute, if it is a claim for "just compensation" against the government. This statute, section 2(c) of the Merchant Marine Act of 1920, 41 Stat. 989 (46 USCA, § 862 [c]), provided that "just compensation" upon *Page 200 
the modification, suspension, or cancellation of war contracts should be determined by the shipping board and any person dissatisfied would be entitled to 75 per cent. of the amount so determined and bring suit for any further "just compensation" claimed by him, in the manner provided by Judicial code, § 24, par. 20, § 145 (28 USCA, §§ 41 [20], 250). The latter acts provide that claims against the United States in excess of $10,000 may be determined in the court of claims, and if for a lesser amount, then either in the court of claims or in the district courts of the United States. The case of United,States v. Skinner Eddy Corporation, supra, is not applicable in the instant case, where we have a direct assumption of the lumber company's claim by the government. The judgment became the liability of appellant either as principal or as assignee of the Fleet Corporation. In the Skinner Eddy CorporationCase, the claim for set-off was based on losses which the Skinner Eddy Corporation itself was alleged to have incurred as a result of the cancellation of the war contract. The court recognized the distinction between a liquidated and an unliquidated claim. The amount of the Skinner Eddy claim had been determined by an agency of Congress and the United States conceded the right to set off the amount thus adjudicated, but the Skinner Eddy Corporation rejected the award. The court undoubtedly recognized the right to set off a liquidated claim in the following language:
"So the real question involved here is, not the right of the defendant to set off a liquidated claim against the government, but its right to litigate the amount of its claim against the government over and above the amount fixed as just compensation by *Page 201 
the Shipping Board in the district court, or whether it shall be required to pursue the course fixed by congress to determine the amount of such compensation and thus liquidate its claim. We see no escape from the conclusion that the district court had no jurisdiction to determine the amount of defendant's just compensation. * * * We conclude that the claims of the defendant for just compensation against the government are within the exclusive jurisdiction of the court of claims, whether the right be asserted by an original suit or by way of counterclaim, and that the district court had jurisdiction of the other set-offs claimed."
The Skinner Eddy Case, which appellant so vigorously stresses, was one where the amount had not been liquidated. The opinion points out that the purpose of the special statutory procedure was to liquidate complicated claims for "just compensation," the court stating:
"Congress had the right to determine for itself the just compensation to be allowed on such unliquidated claims against the government and to determine what amount it would pay on all government obligations. It also had the power to delegate to a court or board the right or jurisdiction to determine such amounts. * * * It is perhaps unnecessary to discuss the policy or attitude of congress toward the multitude of claims, difficult of adjudication, growing out of the enormous operations of the government during the world war, but it is obvious that the ordinary fiscal policy of the government requires consistency in arriving at amounts to be paid and in the payment thereof. Was it the intention of congress that claims of this difficult type against the government, of over $10,000, amounting sometimes to scores of millions of dollars, should be determined by juries in district court proceedings, or by the *Page 202 
judges of the court of claims trained in the consideration of intricate problems involved in such determinations? * * * It is obvious that the trial of such a matter, involving such complications, before a jury, would not only result in great hardship to the jury, and tremendous interference with the other business of the court, but that the conclusion of the jury would be very apt to be erroneous because of the difficulty * * * of carrying so great a mass of evidence in mind for so long a period."
In the instant case, however, the amount of the claim against the government has been liquidated by the Federal court and thus the question in the Skinner Eddy Corporation Case is not involved. This is likewise true of Nassau Smelting RefiningWorks, Ltd. v. United States, 266 U.S. 101 (45 Sup. Ct. 25), where the claims were evidently in dispute, as it was contended that the agreement in question was not executed in the manner prescribed by law.
Appellant further claims that if the set-off is for breach of contract it may be asserted only in the court of claims because the amount is in excess of $10,000, citing Illinois Central R.Co. v. State Public Utility Commission of Illinois,245 U.S. 493 (38 Sup. Ct. 170), and Schillinger v. United States,155 U.S. 163 (15 Sup. Ct. 85). These cases, however, are beside the mark. The former denied the right of a private suitor to file a cross-bill against the United States. The case, however, involved a special statute governing suits to set aside orders of the interstate commerce commission to which the United States was required to be a party. Such suits had to be brought in a designated Federal district court and defendant unsuccessfully contended that the filing of a cross-bill made the special statutory procedure inapplicable. The SchillingerCase, supra, *Page 203 
in which the court held that the United States could not be sued without its consent, involved a tort suit against the government and requires no further discussion.
The set-off in the instant case was properly allowed. Statutory authority is found in Rev. Stat. § 951 (28 USCA, § 774) which provides:
"In suits brought by the United States against individuals, no claim for a credit shall be admitted, upon trial, except such as appear to have been presented to the accounting officers of the Treasury, for their examination, and to have been by them disallowed, in whole or in part, unless it is proved to the satisfaction of the court that the defendant is, at the time of the trial, in possession of vouchers not before in his power to procure, and that he was prevented from exhibiting a claim for such credit at the treasury* by absence from the United States or by some unavoidable accident."
The Supreme Court has ruled that the statute regulating the determination of the amount of a set-off should be liberally construed, for in United States v. Wilkins, 6 Wheat. (19 U.S.) 135, 144, it said:
"The terms of these sections are very broad and comprehensive. * * * There being no limitation as to the nature and origin of the claim for a credit which may be set up in the suit, we think it a reasonable construction of the act, that it intended to allow the defendant the full benefit, at the trial, of any credit, whether arising out of the particular transaction for which he was sued, or out of any distinct and independent transaction, which would constitute a legal or equitable set-off, in whole or in part, of *Page 204 
the debt sued for by the United States. The object of the act seems to be, to liquidate and adjust all accounts between the parties, and to require a judgment for such sum only, as the defendant in equity and justice should be proved to owe to the United States."
The probate court of Michigan had jurisdiction to hear the set-off in the instant case. It is a constitutional court with statutory jurisdiction but it nevertheless exercises equitable powers. In Brooks v. Hargraves, 179 Mich. 136, 145, the court said:
"Probate courts are not courts of law, strictly speaking.Rodgers v. Huntley, 166 Mich. 129. They exercise equitable powers as well."
Under 3 Comp. Laws 1929, § 15682, probate courts have jurisdiction to hear set-offs in settlement of claims against the estate. The above statute provides:
"When a creditor against whom the deceased had claims shall present a claim to the commissioners, the executor or administrator shall exhibit the claims of the deceased in offset to the claims of the creditor, and the commissioners shall ascertain and allow the balance against or in favor of the estate, as they shall find the same to be; but no claim barred by the statute of limitations shall be allowed by the commissioners in favor of or against the estate, as a set-off or otherwise."
In construing this provision, we said in Willard v. Fralick,31 Mich. 431:
"The power of commissioners is peculiar and very broad, and we think the language of this section should not be narrowed beyond its terms, and should allow a proper set-off in all cases." *Page 205 
The allowance of a set-off against the United States finds support in equitable principles, in addition to the Federal statute. In United States v. National City Bank of New York,83 Fed. (2d) 236 (106 A.L.R. 1235) (certiorari denied,299 U.S. 563, [57 Sup. Ct. 25]), the Circuit Court of Appeals held:
"This suit is in equity, where it is recognized that debts should be paid, and the adjustments of demands by set-off rather than by independent suit is favored and encouraged. * * * It has been expressly recognized that 'the argument (for allowing a set-off) is the stronger, if the creditor, from any cause (its sovereign immunity), cannot be coerced to pay his demand.' United States v. Mann, 26 Fed. Cas. 1151, No. 15,716.
"There has never been any doubt either at law or in equity that one debt was equally as entitled to payment as another. The only doubt was whether the trial of the two claims in the same case was convenient. In equity, inconvenience is not allowed to accomplish an injustice by preventing a set-off if it appears that a defendant has no adequate means for recovery in a separate action."
In the instant case the estate may be met with the defense of limitations if it were required to sue in an independent action.
The tendency of the United States Supreme Court is to allow a set-off against the government when the latter brings suit. In the very recent opinion in American Propeller Manfg. Co.
v. United States, 300 U.S. 475 (57 Sup. Ct. 521), the court said:
"We have said (United States v. The Thekla, 266 U.S. 328,339-341 [45 Sup. Ct. 112]): When the United States comes into court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with *Page 206 
regard to the subject matter. The absence of legal liability in a case where but for its sovereignty it would be liable does not destroy the justice of the claim against it. * * * The reasons are strong for not obstructing the application of natural justice against the government by technical formulas when justice can be done without endangering any public interest.' If the principle thus stated is not strictly applicable, it at least suggests that the court should not affirm what is clearly an unjust and inequitable result unless under plain compulsion of law."
The contention of appellant is conclusively answered by the Circuit Court of Appeals, United States v. National City Bank,supra. The government as assignee of a foreign government sued for an amount on deposit in defendant bank to the credit of a foreign government. In allowing the bank to set off the promissory notes of a foreign government discounted by and payable at the bank, the court said:
"The next question is whether sovereign immunity from suit bars this set-off. Set-offs against the sovereign United States have been allowed where it was plaintiff. United States v.Wilkins, 6 Wheat. (19 U.S.) 135; United States v. MacDaniel, 7 Pet. (32 U.S.) 1; United States v. Kimball, 101 U.S. 726;United States v. Ringgold, 8 Pet. (33 U.S.) 150. The supreme court has held, independently of any statute, that, where the sovereign brings a suit, it submits to the application of the same principles which govern private suitors. The PaqueteHabana, 189 U.S. 453 (23 Sup. Ct. 593); The Nuestra Senora deRegla, 108 U.S. 92 (2 Sup. Ct. 287); The Siren, 7 Wall. (74 U.S.) 152. In The Siren, supra, the principle of a sovereign plaintiff's submission to jurisdiction was held subject to the qualification that no affirmative judgment could be entered, *Page 207 
but in The Nuestra Senora Case, supra, an affirmative judgment against a sovereign was upheld, and the previous qualification of the right against the government was removed. This was followed in 1902 in The Paquete Habana, supra, and later reaffirmed in United States v. The Thekla, 266 U.S. 328
(45 Sup. Ct. 112).
"If a sovereign state goes into court seeking its assistance, it is in accord with the best principles of modern law that it should be obliged to submit to the jurisdiction in respect to a set-off or counterclaim properly assertable as a defense in a similar suit between private litigants. The Gloria, 286 Fed. 188. See French Republic v. Inland Navigation Co., 263 Fed. 410, 411. Where a sovereign voluntarily litigates, he must play the role of a litigant like any other suitor and abide by the consequences. See Richardson. v. Fajardo Sugar Co.,241 U.S. 44 (36 Sup. Ct. 476); People of Porto Rico v. Ramos,232 U.S. 627 (34 Sup. Ct. 461); Clark v. Barnard, 108 U.S. 436, 447, 448
(2 Sup. Ct. 878). It is now established that, where a sovereign comes into court, he is unarmed with immunity as against the rights of a defendant who has a proper set-off to his claim."
The trial court was correct in permitting the set-off to the extent of extinguishing the claim of the government and the judgment of the lower court, allowing the set-off and remanding the case to the probate court with instructions, is affirmed. A public question being involved, no costs will be allowed.
FEAD, C.J., and NORTH, WIEST, BUSHNELL, SHARPE, POTTER, and CHANDLER, JJ., concurred.
* See 42 Stat. at L. 24, §§ 304, 305, transferring certain powers and duties of officers of the treasury to the general accounting office. — REPORTER. *Page 208